## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 11-cv-62671-KMM

SNP BOAT SERVICE S.A.,

      Appellant,

vs.

HOTEL LE ST. JAMES,

      Appellee.

_____/

### ORDER

THIS CAUSE is before the Court on an appeal from the Bankruptcy Court's October 19, 2011 Final Judgment on Order Denying with Prejudice Motion for Entry of Order Entrusting *M/Y Sixty Five* to Foreign Representative for Administration in French Bankruptcy (*Sauvegarde*) Proceeding. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001. For the reasons stated herein, the Bankruptcy Court's Judgment is affirmed-in-part, reversed-in-part, and remanded for further proceedings not inconsistent with this Opinion.

### FACTUAL BACKGROUND

#### A. The French (and Canadian) Connection

Debtor-Appellant SNP Boat Service S.A. ("SNP") is a corporation organized under the laws of France. In addition to designing luxury boats, SNP provides brokerage, charter, and boat management services associated with its principal line of business. Appellee Hotel Le St. James ("St. James") is a corporation organized under the laws of Canada. In May 2008, SNP executed a contract for the sale of a vessel to a third party. The terms of the contract required SNP to

1

accept the trade-in of the *M/Y Saint James*—a separate vessel owned by St. James—and credit €2,500,000 to St. James' account upon delivery.

The *M/Y Saint James* was ultimately delivered to SNP; however, SNP took issue with the condition of the vessel. SNP claimed the vessel "had not been delivered in good maintenance and operating condition." Appellant's Br., at 3 (ECF No. 12). SNP also claimed that it had not received proper documentation upon the delivery of the vessel. Consequently, on October 22, 2008, SNP informed St. James that the terms of the contract had not been fulfilled and SNP would not be crediting St. James' account pursuant to the terms of the contract. St. James disputed SNP's conclusion that St. James had breached the contract in a letter it sent to SNP approximately two days later.

The emerging contract dispute between SNP and St. James then took on a decisively international flavor. On October 27, 2008, SNP initiated an action against St. James in the Commercial Court of Cannes, France (the "French proceeding"). On November 6, 2008, St. James initiated a separate action against SNP in the Court of Montreal in Canada (the "Canadian proceeding"). At the Canadian proceeding, SNP argued that the Court of Montreal lacked both personal jurisdiction over SNP and subject matter jurisdiction to consider St. James' breach of contract claim. The Canadian courts denied SNP's jurisdictional arguments at both the trial and appellate level.

On April 7, 2009, the French Commercial Court approved a French *sauvegarde* proceeding for SNP. The goals of a *sauvegarde* proceeding are to "facilitate the reorganization of the debtor in order to pursue its commercial activity, to maintain its employments and to repay its debts." Appellant's Br., at 2–3. Often compared to reorganization under Chapter 11 of the U.S. Bankruptcy Code, a *sauvegarde* proceeding imposes an automatic stay on any legal

proceeding initiated by creditors of the debtor.[1]  The French Supreme Court has held that this automatic stay has an international effect.[2]  On August 25, 2009, St. James submitted an unsecured claim in the *sauvegarde* proceeding for the price of the *M/Y Saint James*, plus interest, damages, and other costs.

As the French *sauvegarde* proceeding was taking place, the Canadian proceeding was also progressing.   After SNP's jurisdictional arguments were rejected, SNP's Canadian counsel withdrew.   The Superior Court of Quebec served   notice on SNP and SNP's Foreign Representative that the Court would enter judgment against SNP should SNP not obtain replacement counsel and defend itself in the Canadian litigation.  SNP failed to defend itself, and on October 16, 2009, the Superior Court of Quebec entered a default judgment in the amount of CAD $4,047,500 in favor of St. James and against SNP (the "Canadian judgment").

B. Coming to America

At some point after obtaining the Canadian judgment St. James learned SNP had assets located in Florida, and on February 17, 2010, St. James domesticated the Canadian Judgment in Broward County, Florida.  Shortly thereafter, the Broward County Sheriff's office seized two of SNP's vessels—the *M/Y Sixty Five* and the *M/Y Foursome*—pursuant to a writ of execution issued by the state court.  Before the vessels could be sold to satisfy St. James' judgment,

---

[1]   See Adam Gallagher, The Need for a New Overhaul of French Insolvency Law to Facilitate Debt-Equity Swaps, AM. BANKR. INST. J., Apr. 2010, at 22 ("In France, the Business Safeguard Act of 2005 made significant changes to the law that was applicable to distressed companies, with the aim of promoting the recovery of ailing companies.  These changes notably included the introduction of safeguard proceedings (procédure de sauvegarde), said to be inspired by chapter 11."); see also WEIL, GOTSHAL & MANGES LLP, COMPARATIVE GUIDE TO RESTRUCTURING PROCEDURES   2012,   at   48–60   (2012),   available   at   http://business-finance-restructuring.weil.com/wp-content/uploads/2012/03/Comparative-Study.pdf (comparing French *sauvegarde* proceedings with U.S. Chapter 11 proceedings).
[2] Cour de cassation [Cass.] [supreme court for judicial matters] 1e civ., Dec. 19, 1995, Bull. civ. I, No. 93-20-424 (Fr.).

however, the French Commercial Court designated Pierre-Louis Ezavin as administrator of SNP, and on April 6, 2010, Ezavin filed a Chapter 15 Petition in U.S. Bankruptcy Court seeking recognition of the French *sauvegarde* proceeding as a "foreign proceeding" pursuant to 11 U.S.C. § 1515.

On April 28, 2010, the bankruptcy court formally recognized the French *sauvegarde* proceeding as a foreign main proceeding and Ezavin as SNP's foreign representative. Pursuant to 11 U.S.C. § 362, the bankruptcy court also ordered a stay with respect to the sale of any SNP property located within the United States. Finally, the court released the *M/Y Sixty Five* to Ezavin's custody, but prohibited the vessel from leaving the Southern District of Florida and ordered that any transfer or sale of the vessel was subject to court approval.

One week later, SNP motioned the bankruptcy court to enter an order finding the *M/Y Sixty Five* subject to the jurisdiction of the French Commercial Court *sauvegarde* proceeding, and entrusting the *M/Y Sixty Five* to Ezavin (the "Entrustment Motion"). St. James opposed the motion on several grounds. A hearing was scheduled for June 8, 2010, but was ultimately continued to August 9, 2010 due to concerns the bankruptcy court had regarding international comity. Complicating matters, on June 17, 2010, the French Commercial Court entered a declaratory judgment finding SNP not liable for the €2,500,000 price of the *M/Y Saint James*.

On August 9, 2010, the bankruptcy court granted SNP's Motion to Continue the Entrustment Motion Hearing. The court also ordered the parties to attend a second settlement conference,[3] which was to take place on September 7, 2010. The bankruptcy court ordered that

---

[3] On July 20, 2010, SNP and St. James were scheduled to engage in a court-ordered settlement conference before United States Bankruptcy Judge Erik P. Kimball. Ezavin appeared telephonically, and the parties reached an impasse. In his report following the failed settlement conference, Judge Kimball stated that he believed Ezavin's failure to appear in person "was a material cause of the parties' failure to reach an agreement." Appellee's Br., at 4 (ECF No. 17).

Ezavin and a senior SNP representative with authority to bind SNP appear in person at the September 7, 2010 settlement conference. A status conference was then scheduled for the day after the settlement conference, at which time matters of discovery and scheduling were to be discussed.

St. James then served a request for production on SNP, seeking, *inter alia*, all documents filed in the *sauvegarde* proceeding; and translations of all pleadings in the *sauvegarde* proceeding. At the same time St. James served the request upon SNP, St. James motioned the bankruptcy court to shorten SNP's deadline to respond to the production request. The court granted St. James's Motion, before granting SNP's motion for reconsideration; limiting the scope of the production request to a docket sheet of the *sauvegarde* proceeding along with select documents from the docket sheet; and continuing the settlement conference to November 2010.

The November settlement conference resulted in an impasse and on November 8, 2010, the Parties had a status conference with the bankruptcy court. At the status conference, St. James continued to argue that further discovery was needed, and for the first time the existence of a French blocking statute was brought to the attention of the bankruptcy court. Before the status conference adjourned, the bankruptcy court rejected SNP's suggestion that pre-discovery summary judgment could resolve the action, and the parties agreed to hold another conference with the bankruptcy court on December 2, 2010 to discuss the scope of discovery, a timeline for discovery, and to further examine the effect of the French blocking statute.[4] Not satisfied with

---

[4] Blocking statutes consist of "legislation that is specifically designed to prevent domestic individuals or corporations from having to comply with U.S. discovery production requests." Kristen A. Knapp, Enforcement of U.S. Electronic Discovery Law Against Foreign Companies: Should U.S. Courts Give Effect to the EU Data Protection Directive?, 10 RICH. J. GLOBAL L. & BUS. 111, 122 (2010). Such statutes traditionally prohibit "'the disclosure, copying, inspection, or removal of documents located in the territory of the enacting state in compliance with orders

the bankruptcy court's decision to postpone summary judgment until after discovery, on November 22, 2010, SNP filed a Motion for Judgment on the Pleadings in Connection with its Entrustment Motion.

At the December 20, 2010 status conference, the Parties argued SNP's Motion for Judgment on the Pleadings, and discussed the need for further discovery. The effect of the French blocking statute was also discussed. Counsel for St. James informed the bankruptcy court that France has a blocking statute, which, as counsel for St. James described it, "makes discovery in France not pursuant to the Hague Convention a criminal act." Dec. 20, 2010 Hr'g, at 37 (ECF No. 2-24). The bankruptcy court then denied without prejudice SNP's Motion for Judgment on the Pleadings, directed the Parties to appear for a status conference on December 17, 2010 with an agreed upon discovery plan, and urged the Parties to find a way to conduct discovery in a manner compliant with the French blocking statute. At the December 17, 2010 conference before the bankruptcy court, the Parties agreed that St. James would be able to depose representatives of SNP in late March 2011. The depositions would take place outside of France to avoid violating the French blocking statute.

To prepare for the March 2011 depositions, St. James served document requests upon Ezavin and SNP in early February 2011. Before responding to St. James' requests, on March 10, 2011 SNP filed a Motion for a Protective Order. In its Motion, SNP sought to preclude the depositions of several SNP representatives. SNP, pursuant to the advice of new counsel, argued that attempting to circumvent the French blocking statute outside of France would constitute fraud in France, and doing so could subject the representatives of SNP to civil or criminal

---

of foreign authorities,' and all such statutes 'appear to carry some penal sanction.'" Id. (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442 n.4 (1987)).

penalties.  SNP proposed that St. James initiate an action in France and have all discovery supervised by the French courts in accordance with the Hague Convention.

Approximately three weeks after filing its Motion for a Protective Order, SNP responded to St. James' document requests.  SNP informed St. James that no documents would be produced.  The scope of St. James' requests had led SNP to believe St. James was attempting to re-litigate the original *sauvegarde* proceeding,[5] which, SNP argued, was improper because St. James had filed an appeal with the French Appellate Courts.  Furthermore, St. James already had the opportunity to obtain discovery in the *sauvegarde* proceeding and was now barred by "*res judicata*, collateral estoppel, and principles of comity." Appellant's Br., at 10.

After receiving SNP's response, St. James concluded that SNP was "intentionally delay[ing] proceedings, and play[ing] games with the discovery process."  St. James' Mot. to Dismiss, at 1 (ECF No. 2-30).  Accordingly, on April 5, 2011, St. James filed a motion which argued that the French blocking statute did not bar discovery in the U.S. bankruptcy court action, and requested that the bankruptcy court deny with prejudice SNP's Entrustment Motion and dismiss the proceeding as a sanction for SNP's alleged misconduct.  In the alternative, St. James requested that the bankruptcy court compel SNP and Ezavin to "properly respond to discovery." Id. at 14.

On April 22, 2011, the bankruptcy court held a hearing on St. James' Motion for Sanctions and SNP's Motion for a Protective Order.  At the outset of the hearing, the bankruptcy court warned SNP that it was "powerfully close" to dismissing the case for "lack of cooperation on the part of the foreign representative" and that it was contemplating "other significant rulings,

---

[5] Among St. James' requests was a request for "English translations of all documents submitted to or relied upon by the Commercial Court of Cannes, France in considering SNP's plan of reorganization of its debts in the Sauvegarde."  St. James' Mot. to Dismiss, at 28 (ECF No. 2-30).

including denying the motion for an order seeking turnover of the vessel." Appellee's Br., at 9. The bankruptcy court noted the "distinct impression" it had that SNP was neither cooperating nor proceeding in good faith. Appellee's Br., at 9. The bankruptcy court then entertained counsels' arguments regarding SNP's alleged misconduct, the applicability of the French blocking statute, and whether due process had been afforded to St. James in the French *sauvegarde* proceeding.

On June 30, 2011, the bankruptcy court issued an Order (1) Denying SNP's Motion for Protective Order, (2) Denying SNP's Entrustment Motion, and (3) Granting in-Part & Denying in-Part St. James' Motion for Sanctions. Citing to U.S. Supreme Court precedent, the bankruptcy court held that the French blocking statute did not deprive the bankruptcy court of its power to order the Parties to engage in discovery. The bankruptcy court then cautioned SNP that if discovery was not conducted prior to an August 19, 2011 status conference "so that [the] court may determine whether due process was afforded in the French proceedings," the bankruptcy court would "conclude that the order granting recognition of the foreign main proceeding was improvidently entered . . . revoke recognition of the foreign main proceeding, and . . . abstain from [the] matter under 11 U.S.C. § 305." June 30, 2011 Order, at 4 (ECF No. 2-25).

Approximately one month later, SNP filed a motion requesting the bankruptcy court to clarify whether the June 30, 2011 Order precluded depositions from being held in France or Monaco. SNP also requested that the bankruptcy court continue the August 19, 2011 status conference to September due to the month-long August holiday in France. On August 4, 2011, the bankruptcy court denied SNP's motion after having accused SNP of filing the motion as "an apparent tactical maneuver to present the court with a *fait accompli* in late August." Appellant's Br., at 13.

At the August 19, 2011 status conference, SNP once again argued that the French blocking statute precluded discovery outside the scope of the Hague Convention, and that the bankruptcy court lacked authority to inquire whether St. James was afforded due process in the French *sauvegarde* proceedings. The bankruptcy court disagreed and notified the parties that it intended to deny with prejudice SNP's Entrustment Motion and abstain from the action. On October 20, 2011, the bankruptcy court denied with prejudice SNP's Entrustment Motion, directed the U.S. Marshals Service to take possession of the *M/Y Sixty Five* from Ezavin and transfer it to the Broward County Sheriff's office, and dismissed the case.

SNP now appeals the Bankruptcy Court's Order and presents the following issues:

(1) Whether the bankruptcy court, for the purposes of ruling on SNP's Entrustment Motion, erred by insisting on discovery that would enable it to determine whether St. James was afforded due process in the *sauvegarde* proceeding;

(2) Whether the bankruptcy court erred when it concluded that the French blocking statute did not pose an obstacle to compelling the depositions of SNP representatives; and

(3) Whether the bankruptcy court erred by dismissing the proceeding as a sanction.

## DISCUSSION

A. Standard of Review

"The district court must accept the bankruptcy court's factual findings unless they are clearly erroneous, 'but reviews a bankruptcy court's legal conclusions de novo.'" In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996). "Under de novo review, [a] Court independently examines the law and draws its own conclusions after applying the law to the facts of the case, without regard to decisions made by the Bankruptcy Court." In re Brown, No. 6:08-cv-1517-Orl-18DAB, 2008 WL 5050081, at * 2 (M.D. Fla. Nov. 19, 2008) (citing In re Piper

9

Aircraft Corp., 244 F.3d 1289, 1295 (11th Cir. 2001)).  A bankruptcy court's order on discovery
is reviewed for abuse of discretion,  In re Piper Aircraft Corp., 362 F.3d 736, 738 (11th Cir.
2004), as is a bankruptcy court's order dismissing a proceeding as a sanction.  See Goforth v.
Owens, 766 F.2d 1533, 1535–36 (11th Cir. 1985) ("In dismissing plaintiff's action with prejudice
under Rule 41(b), the trial court acted within the bounds of its discretion.").

> B.  The Bankruptcy Court's Inquiry into the French *Sauvegarde* Proceeding

On April 20, 2005, President George W. Bush signed into law the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109–8, 119 Stat. 23
(Apr. 20, 2005).  Title VIII of BAPCPA repealed § 304 of the U.S. Bankruptcy Code and
replaced it with Chapter 15 of the U.S. Bankruptcy Code.  The express purpose of Chapter 15 is
to "incorporate the Model Law on Cross-Border Insolvency so as to provide effective
mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).  A
Chapter 15 action is initiated by filing a petition for recognition of a foreign proceeding under
section 1515. Id. § 1504.

Upon recognition of a foreign proceeding, section 1521(a) provides a bankruptcy court
the power to grant "any appropriate relief" requested by a foreign representative.  This relief
includes "entrusting the administration or realization of all or part of the debtor's assets within
the territorial jurisdiction of the United States to the foreign representative or another person . . .
authorized by the court," 11 U.S.C. § 1501(a)(5), and "entrust[ing] the distribution of all or part
of the debtor's assets located in the United States to the foreign representative or another person
. . . authorized by the court, *provided that the court is satisfied that the interests of creditors in
the United States are sufficiently protected.*"  Id. § 1501(b) (emphasis added).  "In other words,
§ 1521(a)(5) allows the foreign representative to collect property in the United States, and

§ 1521(b) allows the foreign representative to distribute the property in the foreign case, provided that creditors in the U.S. are sufficiently protected pursuant to § 1521(b) and § 1522(a)." In re Atlas Shipping A/S, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009). Thus, it would appear that pursuant to section 1521, a bankruptcy court is, without qualification, empowered to allow a foreign representative to *collect* property in the United States, but is only empowered to allow a foreign representative to *distribute* that property in the foreign proceeding if the bankruptcy court is satisfied that "the interests of creditors in the United States are sufficiently protected." Complicating the distinction section 1521(b) draws between U.S. creditors and non-U.S. creditors, however, is section 1522(a), which provides that, "The court may grant relief under section 1519 or 1521 . . . only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

SNP argues the bankruptcy court, for the purposes of ruling on SNP's Entrustment Motion, erred by insisting on discovery that would enable it to determine whether St. James was afforded due process in the *sauvegarde* proceeding. Framed a different way, SNP essentially argues that the bankruptcy court erred by compelling discovery to determine whether St. James' interests—as a creditor—were "sufficiently protected" in the French *sauvegarde* proceeding. At issue is whether section 1522(a) affords St. James—as a foreign creditor[6]—the same protection section 1521(b) affords U.S. creditors. St. James claims that section 1522(a) creates an "overriding 'sufficient protection' analysis that applies to all [section] 1521 entrustment actions." Appellee's Br., at 18. SNP disputes St. James' claim, arguing that section 1522(a) merely

---

[6] St. James is a Canadian corporation whose only connection to the United States arises from the domestication of a Canadian judgment. Though St. James holds a U.S. judgment, under such circumstances, it is not a "U.S. claimant" for purposes of Chapter 15. See In re Atlas Shipping A/S, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009).

reflects a "general statement of the principle protection of local interests." Appellant's Reply Br., at 6 (ECF No. 18).

The Model Law on Cross-Border Insolvency ("Model Law") of the United Nations Commission on International Trade Law, which Chapter 15 was designed to incorporate,[7] states the following regarding sections 1521(b) and 1522(a):

> It should be noted that the Model Law contains several safeguards designed to ensure the protection of *local interests* before assets are turned over to the foreign representative. Those safeguards include the following: the general statement of the principle of protection of *local interests* in article 22, paragraph 1; the provision in article 21, paragraph 2, that the court should not authorize the turnover of assets until it is assured that the *local creditors'* interests are protected; and article 22, paragraph 2, according to which the court may subject the relief that it grants to conditions it considers appropriate.[8]

United Nations Comm'n on Int'l Trade Law, Model Law on Cross-Border Insolvency with Guide to Enactment, 30th Sess., U.N. Doc. A/CN 9/442 ¶ 157 (1997) (emphasis added). This language—appearing to reflect an intent to protect purely local interests—is tempered, however, by the Model Law's later discussion regarding section 1522(a):

> The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief . . . . In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, *it is not advisable to attempt to limit it to local creditors*. Any express reference to local creditors in paragraph 1 would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting such a definition but would also reveal that *there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality*.

---

[7] See 11 U.S.C. § 1501 ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency . . . ."); see also id. § 1508 ("In interpreting this chapter, the court shall consider its international origin . . . .").

[8] References in the Model Law to "article 22, paragraph 1" correspond to section 1522(a), while references to "article 21, paragraph 2" correspond to section 1521(b), and references to "article 22, paragraph 2" correspond to section 1522(b).

Id. at ¶ 157 (emphasis added).  Thus, according to the Model Law, a bankruptcy court *must* be satisfied that *local creditors'* interests are "sufficiently protected" before allowing a foreign representative to distribute property in a foreign proceeding, and though not an express requirement, is *not precluded* from satisfying itself that *foreign creditors'* interests are "sufficiently protected" before allowing a foreign representative to distribute property in a foreign proceeding.  This interpretation is consistent with the "'exceedingly broad'" authority provided to the bankruptcy court to grant "'any appropriate relief.'"  In re Atlas Shipping A/S, 404 B.R. at 739 (quoting LEIF M. CLARK, ANCILLARY & OTHER CROSS–BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE, § 7[2], at 70 (2008)).  Thus, it was within the bankruptcy court's discretion to ensure St. James was sufficiently protected before granting SNP's Entrustment Motion.

SNP argues that even if the bankruptcy court had discretion to ensure that St. James' interests were sufficiently protected before ruling on the Entrustment Motion, the bankruptcy court exceeded its authority by ordering discovery to determine whether St. James' interests were sufficiently protected in the *specific* French *sauvegarde* proceeding.  According to SNP, the bankruptcy court's actions constituted "nothing less than appellate oversight of a specific French bankruptcy proceeding."  Appellant's Br., at 20.  St. James disputes this claim, and argues that the discovery order was appropriate for other reasons even if the bankruptcy court had no authority to inquire into the specific French *sauvegarde* proceeding.

As several courts have noted, though Chapter 15 replaced § 304 of the U.S. Bankruptcy Code, "many of the principles underlying § 304 remain in effect under chapter 15."  In re Atlas Shipping A/S, 404 B.R. at 739; see also In re Artimm, S.r.L., 335 B.R. 149, 159–60 (Bankr. C.D. Cal. 2005) ("[T]he chapter 15 regime looks somewhat different from that applicable to this case

13

under § 304.  However, there is one provision that is strikingly similar. As under § 304,
§ 1521(b) authorizes the court, upon the request of the foreign representative, to entrust the
distribution of all or part of the debtor's U.S. assets to the foreign representative."); Leif M. Clark
& Karen Goldstein, <u>Sacred Cows:  How to Care for Secured Creditors' Rights in Cross-Border
Bankruptcies</u>, 46 TEX. INT'L L.J. 513, 524 (2011) ("Not surprisingly, the case law under former
§ 304 is still relevant to the interpretation of Chapter 15, especially as it concerns the remedies
available to a foreign representative once recognition has been granted.").  Like the old § 304,
and in many ways to an even greater degree, Chapter 15 directs courts to be guided by principles
of comity.  <u>Compare</u>  11 U.S.C. § 304 (repealed 2005) ("In determining whether to grant relief
under subsection (b) of this section, the court shall be guided by what will best assure an
economical and expeditious administration of such estate, consistent with . . . (5) comity . . . ."),
<u>with</u> 11 U.S.C. § 1507 ("In determining whether to provide additional assistance under this title
or under other laws of the United States, the court shall consider whether such additional
assistance [is] consistent with the principles of comity . . . ."), <u>and</u> <u>id.</u> § 1509(b) ("If the court
grants recognition under section 1517, and subject to any limitations that the court may impose
consistent with the policy of this chapter . . .  a court in the United States shall grant comity or
cooperation to the foreign representative.").

        In <u>Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 709 (2d Cir. 1987), the
Second Circuit considered to what degree principles of comity require a U.S. court to defer to a
foreign bankruptcy proceeding.  Victrix, a Panamanian corporation, had entered into an
agreement with Salen, a Swedish corporation, for the charter of Victrix's ship, the *M/V Ploto*.
Subsequent to their agreement, Salen filed for bankruptcy in Sweden and ceased making
payments to Victrix.  Seeking to recover damages, Victrix pursued arbitration against Salen in

London.  Salen did not appear, and instead directed Victrix to file any claim it had with the bankruptcy estate in Sweden.  Id. at 711.

After obtaining a British judgment in the amount of the London arbitration award, Victrix commenced an *in personam* admiralty action in the district court for the Southern District of New York by attaching an account Salen had that was located in New York.  At the same time, Victrix obtained a New York state court order of attachment against the same funds already attached in the admiralty action.  Salen removed the state action to federal district court, where Victrix motioned the court to confirm the London arbitration award and Salen cross-motioned the court to vacate the attachment.  The district court ultimately ruled in favor of Salen and vacated the attachment.  Id. at 711–12.

On appeal, the Second Circuit affirmed the district court.  Addressing the issue of comity within the context of section 304 cross-border insolvency proceedings, the Second Circuit highlighted the need to extend comity to foreign bankruptcy proceedings, noting that "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."  Id. at 713–14.  The court explained how Congress embodied this belief in section 304, before stating that "[u]nder general principles of comity as well as the specific provisions of section 304, federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat claims of local creditors."  Id. at 714.

Thus, in Victrix, the Second Circuit looked only to whether the "foreign laws" at issue comported with due process and not whether the specific individual proceeding afforded due process.  Id.; see also Cunard Steamship Co. v. Salen Reefer Servs. A.B., 773 F.2d 452 (2d Cir.

15

1985) (analyzing Swedish bankruptcy law to determine whether the foreign bankruptcy proceeding should be accorded comity); In re Metcalfe & Mansfield Alternative Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (holding that a U.S. bankruptcy court "is not required to make an independent determination about the propriety of individual acts of a foreign court."). To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial "second bite at the apple." Chapter 15's directive that courts be guided by principles of comity was intended to avoid such a result. St. James is no more entitled to SNP's assets than any other creditor of SNP outside the determinations of the foreign insolvency proceeding. Thus, it was an abuse of the bankruptcy court's discretion to order discovery for the purposes of determining whether St. James' interests were sufficiently protected in the specific French *sauvegarde* proceeding. St. James has not advanced the argument that creditors' interests are not sufficiently protected under French *sauvegarde* law and this Court has no reason to determine otherwise. In concluding that jurisdiction is limited to a determination that French *sauvegarde* proceedings generally are sufficient to protect creditors' interests, it follows that a bankruptcy court is without jurisdiction to inquire whether a particular creditor's interests are sufficiently protected in any specific foreign proceeding.

St. James is incorrect to argue that discovery was proper for the purposes of determining to which country comity should be extended in light of the "unique situation the bankruptcy court . . . faced—that it was being asked to choose between granting comity to Canada or granting comity to France." Appellee's Br., at 20. The French *Sauvegarde* proceeding commenced on April 7, 2009, and imposed an automatic stay on any legal proceeding initiated

16

by creditors of the debtor.   It was not until after St. James specifically consented to the jurisdiction of the French Courts—by submitting an unsecured claim in the *sauvegarde* proceeding—that the Superior Court of Quebec entered a default judgment in favor of St. James. Comity, the goals of Chapter 15, and the "public policy of ensuring equitable and orderly distribution of local assets of a foreign bankrupt" dictate that domestic courts "generally recognize foreign judgments and proceedings where the creditor voluntarily submitted to the foreign court's jurisdiction."   Victrix, 825 F.2d at 715.[9]

### C.   The French Blocking Statute

Notwithstanding the bankruptcy court's purpose for ordering discovery, SNP claims that the bankruptcy court's June 30, 2011 Order requiring representatives of SNP to be deposed was improper in light of the French blocking statute.   "It is well settled that [the French blocking statute does] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa, 482 U.S.

---

[9] As the Supreme Court has stated:

> [I]t follows that every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance therance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony.

Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 537–38 (1883).   It is also worth noting that upon recognition of a foreign proceeding, 11 U.S.C. § 1509(b) specifically provides that a court shall grant comity to the "foreign representative" and says nothing regarding comity toward "foreign creditors."

522, 544 n.29 (1987) (citing <u>Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers</u>, 357 U.S. 197, 204–06 (1958)). As the Supreme Court has noted, deferring to such a statute would "engraft a rule of first resort onto the Hague Convention," "provide the nationals of such a country with a preferred status in our courts," and would otherwise appear to "represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge." <u>Id.</u>  SNP's attempt to distinguish well established precedent based on its claim that French authorities are only now enforcing the statute does not change the sovereignty considerations underlying the Supreme Court's analysis of the French blocking statute.  Therefore, the bankruptcy court did not abuse its discretion when it disregarded the French blocking statute and ordered that representatives of SNP be deposed.

D.  <u>The Bankruptcy Court's Dismissal of the Chapter 15 Proceeding as a Sanction</u>

Finally, SNP argues that the bankruptcy court abused its discretion when it dismissed the Chapter 15 proceeding as a discovery sanction.  Though it is true that SNP's conduct leaves much to be desired, it is also true that throughout the course of the eighteen month bankruptcy proceeding, only one discovery order was entered.  Indeed, once the bankruptcy court issued its June 30, 2011 Order—the first time the bankruptcy court definitively ruled the French blocking statute had no force—SNP began complying with discovery.  The bankruptcy court, however, perceived SNP's subsequent Motion for Reconsideration—which requested the bankruptcy court to clarify its order and continue the deadline for conducting discovery—as a dilatory tactic and dismissed the Chapter 15 proceeding as a sanction.

"The severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." <u>Malautea v. Suzuki Motor Co.</u>, 987 F.2d 1536, 1542 (11th Cir. 1993) (citing <u>Navarro v. Cohan</u>,

856 F.2d 141, 142 (11th Cir.1988)).  The bankruptcy court's Order Denying SNP's Entrustment Motion with Prejudice does not explore or otherwise discuss how a lesser sanction would fail to ensure compliance with the court's orders.  This omission, when combined with this Court's determination that the bankruptcy court exceeded its jurisdiction when it inquired into SNP's French *sauvegarde* proceeding, leads this Court to conclude that the bankruptcy court abused its discretion when it denied SNP's Entrustment Motion with Prejudice as a sanction.

## CONCLUSION

In light of the foregoing, the bankruptcy court's orders are affirmed-in-part and reversed-in-part.  The bankruptcy court acted within its discretion when it disregarded the French blocking statute and ordered that the representatives of SNP be deposed.  The bankruptcy court, however, abused its discretion when it ordered discovery to determine whether St. James' interests were sufficiently protected in the specific French *sauvegarde* proceeding.  Furthermore, the bankruptcy court abused its discretion when it dismissed SNP's Entrustment Motion with Prejudice as a sanction.

Accordingly, the Bankruptcy Court's Final Judgment and Order Denying with Prejudice Motion for Entry of Order Entrusting M/Y Sixty Five to Foreign Representative, both dated October 20, 2011, are hereby VACATED.  The Bankruptcy Court's Discovery Order dated June 30, 2011 is REVERSED, and this matter is REMANDED for further proceedings not inconsistent with this Opinion.  The Clerk of the Court is instructed to CLOSE this case.

DONE AND ORDERED in Chambers at Miami, Florida, this /8th day of April, 2012.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record